Date signed August 05, 2011



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at Greenbelt

| | | | |
|---|---|---|---|
| In Re: | * | | |
| Thermopylae, LLC | * | Case No. | 10-32452-TJC |
| | * | Chapter | 11 |
| Debtor | * | | |
| ***************************************** | * | | |
| Rockville Pike Joint Venture L.P. | * | | |
| Plaintiff | * | | |
| vs. | * | Adversary No. | 11-00016 |
| Thermopylae LLC; | * | | |
| The Harbor Bank of Maryland | | | |
| Defendants | * | | |

**MEMORANDUM OF DECISION**

Rockville Pike Joint Venture, L.P. ("Plaintiff") seeks a preliminary injunction enjoining the defendants Thermopylae, LLC (the "Debtor") and The Harbor Bank of Maryland (the "Bank") from removing Equipment and Section 11.02 Property, as those terms are defined herein, from the space Plaintiff leased to the Debtor. The parties dispute whether the Plaintiff or

1

the Debtor owns the Equipment and Section 11.02 Property and, if the Plaintiff owns it, whether the Bank's security interest trumps the Plaintiff's ownership rights.  For the reasons stated herein, the Court will deny the motion with respect to the Equipment, because the Lease provides that the Debtor was entitled to remove it upon expiration of the Lease.  With respect to the Section 11.02 Property, the Court concludes that the Plaintiff's right to claim ownership of it arose long after the Bank's security interest attached.  The Court therefore will grant the motion with respect to the Section 11.02 Property only on a limited basis, and will lift the injunction on the Section 11.02 Property upon a showing by the Bank that it can comply with Section 12.03 of the Lease to repair and restore the Premises upon removal.

## FINDINGS OF FACT

*The Lease*

On or about April 21, 1999, Plaintiff, as landlord, and Alpha Restaurant Group, Inc. d/b/a Broadway Diner ("Alpha"), as tenant, entered into a lease (the "Lease") for approximately 9,433 square feet of retail area located at 895 Rockville Pike, Rockville, Maryland 20852 (the "Premises").  On or about August 31, 2005, Alpha assigned the Lease to Debtor.  The Debtor operated the Hollywood Diner at the premises until it closed on January 11, 2011.

*The Chi-Chi's Equipment and the Equipment at the Premises Today*

The previous tenant operated a Chi-Chi's restaurant on the Premises.  It was referred to by the parties in this proceeding as "Chi-Chi's" and will be referred to here the same way.  Chi-Chi's left behind certain furniture, fixtures and equipment (the "Chi Chi's Equipment").  Apparently, the Plaintiff did not take or maintain any inventory list of the Chi Chi's Equipment although as will be discussed more fully below, that fact is not clear based on the testimony of the Plaintiff's representative.

Alpha tore out and discarded all of the Chi Chi's Equipment except for the oven hood and the dishwashing system.  Alpha built an entirely new kitchen, including replacing much of the flooring and installing new walk-in freezers, walk-in refrigerators, oven, grill, stoves, steel preparation/work tables and other kitchen equipment.  Alpha installed the new kitchen and made other tenant improvements to the Premises from November 1999 to August 2000, and opened for business on or about August 14, 2000.  Subsequently, and from time to time, Alpha or the Debtor replaced some of the equipment that Alpha installed during the November 1999 to August 2000 improvement period.

There is no dispute among the parties as to the oven hood and dishwashing system, which all parties agree was part of the Chi-Chi's Equipment and remains at the Premises today.   For purposes of this Memorandum, all of the kitchen equipment at the Premises today, including but not limited to the walk-in freezers, walk-in refrigerators, oven, convection oven, grill, stoves and steel preparation/work tables, except for the oven hood and dishwashing system, is referred to as the "Equipment."  The Court finds and concludes that Alpha or the Debtor paid for all of the Equipment, and none of the Equipment is the Chi-Chi's Equipment.  The Court further finds and concludes that neither Alpha nor the Debtor at any time used any of the Chi-Chi's Equipment, other than the oven hood and dishwashing system.

The testimony and evidence leading to the foregoing factual findings was strikingly different between the parties.  The Plaintiff's representative testified that Alpha stepped into the kitchen left behind by Chi-Chi's substantially as Chi-Chi's left it and made very few changes to it.  She testified that Alpha used virtually all of the Chi-Chi's Equipment and the Chi-Chi's Equipment remains at the Premises today, except for the few pieces that Alpha or the Debtor

replaced over the years through normal wear and tear. She testified that Alpha moved into the Premises and began operating the diner in October or November 1999.

The Court finds the testimony of Plaintiff's representative to lack credibility. Her testimony was inconsistent and contradictory and lacked precision. For example, the record plainly established that Alpha spent many months improving the Premises, and did not begin operating the diner there until August 2000, and not October 1999, a fact the Plaintiff's representative later admitted in rebuttal. She also ultimately admitted other mistakes in her direct testimony. The Plaintiff never produced a list or inventory of the Chi-Chi's Equipment, and can only describe it in generic terms. The Plaintiff's representative could or would not answer the simple question of whether she searched the books and records for an inventory of the Chi-Chi's Equipment, despite numerous inquiries from Debtor's counsel and even the Court.

The owner of the Debtor, Mr. Leonidas Kumatsos, also testified. He visited the Premises three times between May 2000 and August 2000. He testified that the old kitchen had been fully removed and was being replaced the first time he visited it. While his testimony obviously was biased in favor of the Debtor and included some inconsistencies, the Court accepts his testimony at least to the extent it corroborates the testimony of the witness whom the Court finds by far the most credible on this issue, Mr. Vasilios Doufas.

Mr. Doufas was Alpha's general contractor who did the work at the Premises during the October 1999 to August 2000 improvement period. He had no connection to either the Plaintiff or the Debtor. He obtained approval from the City of Rockville, Maryland, of the building plans to renovate the Premises. His company ripped out the entire kitchen and discarded all of the Chi-Chi's Equipment (other than the oven hood and dishwashing system) because it was not usable. His company purchased all new equipment on Alpha's behalf (other than the oven hood and

dishwashing system) and installed it in the Premises. His contract price was more than $600,000. The Court accepts Mr. Doufas's testimony in its entirety and his testimony forms the basis of the above findings of fact.

*The Section 11.02 Property.*

Alpha also made substantial improvements to the exterior of the building. These exterior improvements included installing a new vestibule complete with a doorway and sidelights, adding a red roof curvature and installing chrome or stainless steel trim around the building and windows. These improvements constituted "alterations, decorations, additions and improvements to the Premises made by Tenant" as that phrase is used in Section 11.02 of the Lease, and are referred to herein as the "Section 11.02 Property."

*The Assignment of the Lease to the Debtor and the Bank Loan.*

In 2005, Mr. Kumatsos formed the Debtor and took an assignment of the Lease from Alpha pursuant to a Lease Assignment Agreement, to which the Plaintiff consented. The Debtor changed the name of the diner to Hollywood Diner and operated it until it closed.

To finance the acquisition of the Lease and other assets of Alpha, the Debtor borrowed $650,000 from the Bank, evidenced by loan documents dated January 25, 2006. The security agreement grants the Bank a security interest in all of the assets of the Debtor. As pertinent here, the Bank claims a perfected security interest in the Equipment and the Section 11.02 Property, and that claim was supported by testimony from a Bank official. No party disputed that the Bank holds a perfected security interest in all of the Debtor's assets. As of February 14, 2011, the Debtor owed the Bank $472,011.22 on the loan.

*Termination of the Lease Tenancy.*

The original term of the Lease expired on April 30, 2010. The Debtor thereafter remained in possession on a month-to-month tenancy with the Plaintiff's consent. On August 27, 2010, the Plaintiff sent the Debtor a letter terminating the month-to-month tenancy as of September 30, 2010.

The August 27 letter also stated, in pertinent part:

> In accordance with Section 1.05 of the Indenture of Lease dated April 21, 1999 (the "Lease"), which was assigned to Hollywood Diner pursuant to that certain Lease Assignment Agreement and First Amendment to Lease dated August 31, 2005 (collectively, the "Lease"), Rockville Pike is the owner of the furniture, fixtures and equipment in the Premises and such property must be surrendered to Rockville Pike in the condition required under the Lease on the Lease Expiration Date. Rockville Pike also hereby exercises its right to retain any and all alterations, decorations and improvements in and to the Premises under Section 11.02 of the Lease. It is expected that Hollywood Diner, including its employees, agents and representatives, will not remove any of the foregoing property from the Premises and that it will vacate the Premises on or before the Lease Termination Date without incident and without the need to compel its surrender of the Premises by legal process.

The Debtor was current on its Lease obligations as of the August 27 letter and remained current on September 30, 2010. The Debtor stopped paying rent as of October 1, 2010 and did not pay rent through the date it ceased operating the diner in January 2011. Plaintiff contends that the Debtor owes it in excess of $200,000 in rent and other charges arising after September 30, 2010.

The Debtor has no assets other than the Equipment and the Section 11.02 Property, disputed by the Plaintiff. Mr. Kumatsos testified that he also owns a successful business, Leo's Produce, and has resources to rehabilitate the Debtor. He testified that that he is looking for an alternate location to operate the diner if the Debtor is able to move the Equipment and Section 11.02 Property, subject to the Bank's security interest.

*Procedural History*

Plaintiff initiated this adversary proceeding by filing a complaint and motion for temporary restraining order and preliminary injunction on January 7, 2011, seeking an order preventing the Debtor from removing from the Premises any of the furniture, fixtures or equipment, other than readily removable property, because all such property belonged to it under Sections 1.05 and 11.02 of the Lease.  The Court granted the motion for temporary restraining order after a hearing on January 19, 2011 and set the preliminary injunction hearing for January 25, 2011.  The Plaintiff filed an amended complaint on February 12, 2011 and the Bank filed an answer on February 22, 2011.  The Court held hearings on the preliminary injunction request on February 15 and 23, and March 9, 2011.  This ruling follows.

## CONCLUSIONS OF LAW

Preliminary injunctions are governed by Fed. R. Civ. P. 65, made applicable in bankruptcy proceedings by Fed. R. of Bankr. P. 7065.  The moving party bears the burden of showing that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest.  *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009) (*quoting Winter v. Natural Res. Def. Council, Inc. (Winter)*, 555 U.S. 7, 20 (2008)).  The Supreme Court in *Winter* stated that injunctive relief is an extraordinary remedy and "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter,* 555 U.S. at 22 (*citing Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).

**Likelihood of Success on the Merits**

*The Oven Hood and Dishwashing System*

Neither the Debtor nor the Bank claims a right in the oven hood or the dishwashing system (which are not included in the definition of Equipment herein).  Each represented to the

Court that it does not intend or seek to remove these items. Accordingly, the oven hood and the dishwashing system are outside the scope of the motion and this ruling.

*The Equipment*

Plaintiff contends that pursuant to Section 1.05 of the Lease, it owns all of the Equipment. The Debtor and the Bank contend that the Debtor owns the Equipment, subject to the Bank's lien, because the Equipment was never part of the Chi-Chi's Equipment and Alpha and the Debtor bought and installed it. For the reasons set forth below, the Court concludes that the Plaintiff has not shown a likelihood of establishing that the Debtor is not entitled to remove the Equipment.

Section 1.05 of the Lease states:

> Landlord has obtained from the tenant previously occupying the Premises certain furniture, fixtures and equipment (the "[Chi-Chi's] Equipment"), which Tenant, subject to the terms and conditions set forth in this Section 1.05, may use at no additional rental during the term of this Lease and any renewal or extension hereof. Throughout the term of this Lease and any renewal or extension hereof, Landlord shall retain ownership of the [Chi-Chi's] Equipment and Tenant, at its sole cost and expense, shall maintain the same in good condition and repair. All replacements of the [Chi-Chi's] Equipment shall be and become the property of the Landlord, and upon the expiration of the term of this Lease or sooner termination hereof, Tenant shall surrender possession of the [Chi-Chi's] Equipment in good condition and repair, ordinary wear and tear alone excepted, provided, however, that if Tenant shall remain in possession of the Premises throughout the initial term and any renewal or extension term of the Lease and, upon expiration of such term, shall not be in material default of any of the terms, covenants or conditions of the Lease, Tenant shall be entitled to remove the replacements to any [Chi-Chi's] Equipment from the Premises and to retain the same as its own.

Lease, §1.05.

Plaintiff's theory of the case, its allegations in the complaint, and the grounds for its motion for a preliminary injunction as to Section 1.05 of the Lease can be summarized as follows: When Chi-Chi's vacated the Premises, it left the Chi-Chi's Equipment, which was a

8

fully functioning kitchen that Alpha stepped into without any material change and to which the Debtor succeeded. Although Alpha and the Debtor replaced some items over time to account for ordinary wear and tear, the kitchen today is more or less the same as that vacated by Chi-Chi's. According to the Plaintiff, first Alpha and then the Debtor used the Chi-Chi's Equipment from the first day Alpha operated the diner until the Debtor vacated the Premises. Thus, according to the Plaintiff, because the Equipment is essentially the Chi Chi's Equipment, it owns the Equipment.

The problem with Plaintiff's theory is that the evidence proved to be woefully at odds with it. The Plaintiff's factual presentation was, at best, simply wrong, and at worst, misleading.[1] As found in the Findings of Fact, Alpha replaced the entire kitchen other than the oven hood and dishwashing system. The Equipment that Plaintiff claims to own is not, and never was, the Chi-Chi's Equipment. Neither Alpha nor the Debtor used the Chi-Chi's Equipment, other than the oven hood and dishwashing system.

Notwithstanding the foregoing, however, by the plain terms of the Lease, Plaintiff owned the Equipment, at least until September 29, 2010. This is because Section 1.05 states that "[a]ll replacements of the [Chi-Chi's] Equipment shall be and become the property of the Landlord…" Although the Court finds that Alpha tore out and discarded the Chi-Chi's Equipment, the Court also finds that Alpha replaced the Chi-Chi's Equipment with the Equipment. Under the terms of Section 1.05, the "replacements of the [Chi-Chi's] Equipment shall be and become property of" the Plaintiff.

---

[1] While the Court would seldom conclude a party is being misleading, especially about events that occurred more than ten years ago, the exchange concerning the search for an inventory list described in the Findings of Fact raises the inference that the Plaintiff has not been candid in it presentation. At the least, it appears that Plaintiff failed to undertake sufficient diligence to refresh accurately its institutional memory.

The Debtor contends nevertheless that it is entitled to remove the Equipment and retain it under the following provision of Section 1.05:

> … provided, however, that if Tenant shall remain in possession of the Premises throughout the initial term and any renewal or extension term of the Lease and, upon expiration of such term, shall not be in material default of any of the terms covenants or conditions of the Lease, Tenant shall be entitled to remove the replacements to any [Chi-Chi's] Equipment from the Premises and to retain the same as its own.

Lease, §1.05. This provision provided a reasonable formula for the disposition of any equipment purchased by the tenant during the life of the Lease: If the tenant was not in material default at the expiration of the Lease, it could keep any replacements of the Chi-Chi's Equipment. Otherwise, the Plaintiff keeps it.

The Debtor was not in material default under the Lease on September 30, 2011, the date as of which the Plaintiff terminated the month-to-month tenancy. But the Debtor paid no further rent before it vacated the Premises in January 2011. The Court therefore turns to the question of when the "expiration" of the "initial term and any renewal or extension" of the Lease occurred for purposes of Section 1.05.

As the Maryland Court of Appeals has stated

> It seems so well established that it must be regarded as settled now that, where a tenant is allowed to remain in possession after the expiration of a term, with the consent of the landlord, the law presumes the holding to be on the terms of the original demise and subject to the same rent and to all the covenants of the original lease. Vrooman v. McKaig, 4 Md. 450, 59 Am. Dec. 85; Hall v. Myers, 43 Md. 446; Hobbs v. Batory, 86 Md. 68, 37 Atl. 713; Taylor's Landlord and Tenant, § 58.

*Cramer v. Baugher (Cramer)*, 100 A. 507, 509 (Md. 1917). *See also Gostin v. Needle (Gostin)*, 45 A.2d 772, 773 (Md. 1946) (holding that an option contained in the lease allowing landlord to sell on notice to tenant and requiring landlord to pay liquidated damages to tenant was applicable

10

even when exercised by the landlord after tenant held over and remained in possession with the landlord's consent.)

Under these authorities, the terms and conditions of the Lease applied to the month-to-month tenancy that ran through September 30, 2010. Accordingly, by the express terms of Section 1.05, the Debtor was entitled to remove and retain the Equipment on September 30, 2010 because (1) the Equipment was the replacements of the Chi-Chi's Equipment; and (2) Debtor was not in material default at that time.

The Debtor, however, did not remove the Equipment on September 30, 2011, and it remained in the Property after that date. It became a wrongful holdover. The Lease contains provisions that address a tenant holdover both with and without the consent of the Plaintiff:

> SECTION 24.01. HOLDING OVER.
>
>> (a) Any holding over after the expiration of the term hereof, with the consent of Landlord, shall be construed to be a tenancy from month to month at the rents herein specified (pro-rated on a monthly basis) and shall otherwise be on the terms and conditions herein specified, so far as applicable. In the event of any holding over, Tenant hereby waives any statutory notice which Landlord may be required to give.
>> (b) In the event that Tenant shall holdover after the expiration or other termination of the term of this Lease without the consent of Landlord, it shall be deemed to be a tenant wrongfully holding over at a rental equal to twice the amount of rent due for the month immediately preceding the date when Tenant shall have been deemed to be wrongfully holding over.

Lease, §24.01. Section 24.01(a) expressly provides that the Lease's terms and conditions apply to a holdover with the consent of the Landlord, but Section 24.01(b) contains no similar provision during a wrongful holdover, except as the Lease might otherwise state. Thus Section 1.05, which would otherwise deprive the Debtor of its right to remove the replacements of the Chi-Chi's Equipment upon the Debtor's failure to pay rent, is not applicable after the expiration of the Lease on September 30, 2010. Stated otherwise, Section 1.05 does not apply to what

11

would otherwise be a material default that occurs during the wrongful holdover period to deprive the Debtor of its right to retain the replacements.

Further, the parties have not cited any authority addressing the effect of Debtor's wrongful holdover on its right to remove the Equipment.[2] Plaintiff cites no authority that would lead the Court to conclude that a wrongful holdover loses its rights to personalty that it is entitled to remove upon expiration of a lease. Accordingly, the Court concludes the Plaintiff has not established a likelihood of success with respect to the Equipment.

> *The Section 11.02 Property - All alterations, decorations, additions and improvements to the Premises made by Tenant.*

Section 11.02 of the Lease governs the disposition of "all alterations, decorations, additions and improvements to the Premises made by the Tenant." As stated above, such items are referred to herein as the "Section 11.02 Property". Section 11.02 provides:

> All alterations, decorations, additions and improvements to the Premises made by Tenant or made by Landlord at Tenant's expense, shall remain the property of Tenant for the term of the Lease. Such alterations, decorations, additions and improvements shall not be removed from the Premises prior to the end of the term hereof without prior consent in writing from Landlord, which consent will not be unreasonably withheld, and Landlord shall have a lien on same as additional security under this

---

[2] Maryland Code provides:

**§ 8-402. Tenant holding over; liability**

(a)(1) A tenant under any periodic tenancy, or at the expiration of a lease, and someone holding under the tenant, who shall unlawfully hold over beyond the expiration of the lease or termination of the tenancy, shall be liable to the landlord for the actual damages caused by the holding over.

(2) The damages awarded to a landlord against the tenant or someone holding under the tenant, may not be less than the apportioned rent for the period of holdover at the rate under the lease.

\*\*\*

(4) Nothing contained herein is intended to limit any other remedies which a landlord may have against a holdover tenant under the lease or under applicable law.

These remedies do not include the automatic forfeiture of personalty which the tenant has the right to remove under a lease.

12

> Lease.  Upon expiration or other termination of this Lease, Tenant shall remove all such alterations, decorations, additions and improvements saving and excepting all or any of same which Landlord, by written notice given at least (15) days prior to the expiration or sooner termination hereof, elects to retain, and Tenant shall restore the Premises as provided in Section 12.03 hereof.  If Tenant fails to remove such alterations, decorations, additions and improvements (save as hereinbefore provided) and restore the Premises, then upon the expiration of this Lease, and upon Tenant's removal from the Premises, all such alterations, decorations, additions and improvements shall become the property of Landlord or, at Landlord's option, all or a portion of the same may be removed by Landlord at Tenant's expense, and this provision shall survive the expiration or other termination of this Lease.

Lease, §11.02.  Section 11.02 must be read in conjunction with Section 12.03, to which it refers:

> At the expiration of the tenancy hereby created, Tenant shall surrender the Premises in the same condition as the Premises were in upon delivery of possession thereto under this Lease, reasonable wear and tear excepted, and shall surrender all keys for the Premises to Landlord at the place then fixed for the payment of rent and shall inform Landlord of all combinations on locks, safes and vaults, if any, in the Premises.  <u>Tenant shall remove all of its signs and trade fixtures, and any alterations, decorations, additions and improvements as provided in Section 11.02 hereof, before surrendering the Premises as aforesaid and shall repair any damage to the Premises caused thereby.  Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the term of this Lease.</u>

Lease, §12.03 (emphasis added).  As pertinent here, these provisions are not ambiguous.  Section 11.02 provides that all Section 11.02 Property "shall remain property of the Tenant for the term of the Lease."  It further provides that Tenant may remove Section 11.02 Property but in doing so, "shall restore the Premises as provided in Section 12.03."  Section 12.03, in turn, requires that "Tenant shall . . . repair any damage to the Premises caused by" the removal of the Section 11.02 Property.  And the Tenant's obligation to repair the Premises upon removal of the Section 11.02 Property survives the expiration or termination of the Lease.

13

By its express terms, however, Section 11.02 provides that Section 11.02 Property could become "property of the Landlord" if the Landlord gave written notice that it elected to retain such items "at least fifteen (15) days prior to the expiration or sooner termination" of the Lease. Under the holdings of *Cramer*, 100 A. 507 and *Gostin*, 45 A.2d 772, the terms and conditions of the Lease applied during the month-to-month tenancy that ran through September 30, 2010. In the August 27 letter, the Plaintiff gave written notice that it elected to retain the Section 11.02 Property more than fifteen days prior to the expiration of the Lease on September 30, 2010. According to the Lease, upon the issuance of the August 27 letter, the Section 11.02 Property became "the property of the [Plaintiff]."

While the foregoing establishes the Plaintiff's rights vis-à-vis the Debtor, the same result does not apply to the Bank. The Lease is unequivocal on the controlling point: The Section 11.02 Property "remain[ed] the property of the Tenant" until the triggering date described above. When the Bank's security interest attached to all of the Debtor's assets in 2006, the Debtor, as successor to Alpha, owned the Section 11.02 Property under the express terms of the Lease. The Plaintiff offers no factual or legal support from which this Court could conclude that Plaintiff's election to obtain ownership of the Section 11.02 Property in the August 27, 2010 letter would allow it to take free and clear of the Bank's prior security interest.[3]

---

[3] In a somewhat similar case, the Maryland Court of Special Appeals held that to require the turnover to a landlord of a fixture free and clear of a mechanic's lien would be grossly inequitable and would provide a windfall to the landlord at the expense of the mechanic. *Cabana Inc. v. Eastern Air Control, Inc. (Cabana)*, 487 A.2d 1209, 1213 (Md. Ct. Spec. App. 1985). After the termination of the lease resulting from the tenant's breach, the landlord exercised its right under the lease to repossess a building brought upon the land by the tenant. The building was subject to a mechanic's lien. The trial court found that the lien remained on the building, even upon its forfeiture to the landlord. The Court of Special Appeals affirmed, holding that "the lien remains on the building even though the landlord repossessed the structure. Put another way, the lien stays with the building irrespective of the tenant's departure." *Id.* at 1213.

Perhaps recognizing the difficulty in its position, the Plaintiff took a different approach at the hearing. It was unable to describe with particularity *any* Section 11.02 Property. Instead it contended that "all alterations, decorations, additions and improvements" made by a tenant that otherwise would be Section 11.02 Property became "fixtures" upon their installation as a matter of law. It points out they were installed in 1999 and 2000, prior to the attachment and perfection of the Bank's security interest. The Plaintiff therefore essentially asks the Court to disregard Section 11.02 and conclude that all Section 11.02 Property became fixtures upon their installation and have been owned by Plaintiff since that time. This argument fails under Maryland law.

The term "fixtures" applies to "goods that have become so related to particular real property that an interest in them arises under real property law." MD Code, Commercial Law, §9-102 (2005) (codifying the Uniform Commercial Code). "'Goods' means all things that are moveable when a security interest attaches." MD Code, Commercial Law, §9-102 (2005). The term "fixture" is commonly used to define: (1) ordinary building materials which have become an integral part of the real estate and cannot retain their chattel character for purposes of finance; and (2) an intermediate class which has become real estate for certain purposes, but as to which chattel financing may be preserved. U.C.C. § 9-313 (1992) (Official Comment 3). In other words, fixtures are personalty, which have been "affixed to real property to the extent that they have lost their character as chattel and become associated with the realty." *Reese v. Thomas*, 194 B.R. 782, 788 (Bankr. D.Md. 1996).

To determine whether a good is a fixture, Maryland courts consider three factors:

    (1) annexation to the realty, either actual or constructive;
    (2) adaptation of the article or structure to the use of that part of the realty
    with which it is connected; and

> (3) the intention of the party making the annexation to make the article a permanent accession to the freehold. This intention being inferred from the nature of the article annexed, the situation of the party making the annexation, the mode of annexation, and the purpose for which it was annexed.

*Dudley & Carpenter v. Hurst (Dudley)*, 8 A. 901, 902 (Md. 1887); *Colonial Pipeline Co. v. State Dept. of Assessments and Taxation (Colonial),* 806 A.2d 648, 658 (Md. 2002). Of these factors, "the most important is the question of intention." *Dudley*, 8 A. at 902.

> This is clearly shown by the fact that the law is very different between landlord and tenant and mortgagor and mortgagee, or, what is the same, vendor and vendee; many things being held as fixtures between vendor and vendee which do not lose their character of personal chattels when the question is between landlord and tenant.

*Id.* Further,

> It is well settled law that parties may by their express agreement retain the character of personal property as such and prevent it from becoming a fixture, even though without the agreement the personal property would lose its chattel character and become either a fixture or a part of the realty.

*Reese,* 194 B.R. at 791. And, "[t]he third criterion dealing with intention is preeminent, whereas the first and second criteria constitute evidence of intention." *Colonial* at 661 (*quoting Lingleville Indep. Sch. Dist. v. Valero Transmission Co.,* 763 S.W.2d 616, 618 (Tex. App.1989).

These principles apply here. In Section 11.02, the parties specifically addressed the ownership rights in "all alterations, decorations, additions and improvements" made by the tenants. All of the disputed items that comprise the Section 11.02 Property - the vestibule, doorway, red roof curvature and chrome or stainless steel trim around the building and windows – readily fit within this description and are covered by the provision. Further, the parties specifically agreed in Section 12.03 that the removing party would be obligated to pay any costs

of restoring or repairing the Premises upon removal, and that obligation survives the expiration or termination of the Lease. The Court will not disregard unambiguous Lease provisions that so plainly reflect the parties' agreement on the ownership and disposition of the items in dispute.

Accordingly, the Court concludes that the Plaintiff has not made a "clear showing" of likelihood of success on the merits of its claim that it, rather than the Debtor or the Bank, is entitled to retain the Equipment or the Section 11.02 Property free and clear of the Bank's security interest. This alone is sufficient to deny the motion. Nevertheless, the Court will turn to the remaining factors.

**Irreparable Harm**.

Plaintiff has not established it would be irreparably harmed in the absence of injunctive relief. The Bank acknowledged at the hearing that, if it were to remove the Section 11.02 Property, it must comply with Section 12.03 and repair any damage to the Premises as a result. In the order resolving the motion, the Court will require the Bank to comply with Section 12.03. With respect to the Equipment, it is property of the estate and cannot be sold or otherwise disposed of without further Court proceedings in which the Plaintiff, as a creditor, will have the opportunity to participate.

**The Balance of Equities**.

The balance of equities does not favor Plaintiff. The record established that the Chi-Chis Equipment was not usable and was discarded. The record further established that Alpha paid for the Equipment when it was installed in 1999 and 2000, and Alpha and the Debtor paid for replacement pieces that are included in the Equipment. With respect to the Section 11.02 Property, it also was paid for by Alpha and any costs or damages incurred in its removal will be paid by the Bank.

17

**The Public Interest**.

The resolution of the motion as set forth herein gives effect to the terms of the Lease as written. The enforcement of the parties' agreement serves the public interest.

## CONCLUSION

For the foregoing reasons, the Court will deny the motion with respect to the Equipment. With respect to the Section 11.02 Property, the Court concludes that the Plaintiff's right to claim ownership of it arose long after the Bank's security interest attached. The Court therefore will grant the motion with respect to the Section 11.02 Property only on a limited basis, and will lift the injunction on the Section 11.02 Property upon a showing by the Bank that it can and will comply with Section 12.03 of the Lease to repair and restore the Premises upon removal.

cc:  All parties
     All counsel

**END OF MEMORANDUM OF DECISION**